# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| STAMPEDE PRESENTATION PRODUCTS, INC., <br><br> Plaintiff, <br><br> v. <br><br> INTEL CORPORATION, <br><br> Defendant. | Case No. _____ <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Stampede Presentation Products, Inc. ("Stampede"), by and through its undersigned counsel, for its Complaint against the Defendant alleges:

## PARTIES

1. Plaintiff Stampede Presentation Products, Inc. ("Stampede") is a corporation organized and existing under the laws of the State of New York with its principal place of business at 55 Woodridge Drive, Amherst, New York 14228.

2. Defendant, Intel Corporation ("Intel") is a Delaware Corporation with offices located at 2200 Mission College Boulevard, Santa Clara, California, and a registered agent in Dover, Delaware.

## JURISDICTION AND VENUE

3. The Court has jurisdiction over this action pursuant to 28 U.S.C. Section 1332 as the matter and controversy exceeds $75,000.00 and there is complete diversity of citizenship.

4. Venue is proper in this District pursuant to 28 U.S.C. Section 1391(b)(i) in that Intel is a Delaware corporation with a registered agent in Wilmington, Delaware and pursuant to 28 U.S.C. Section 1391(b)(3), Intel is subject to the Court's personal jurisdiction in this District.

1

5. Venue is further proper by virtue of the jurisdiction selection provision contained in paragraph 16.9 of the UAV Product Supply and Resale Agreement dated August 29, 2017 between Stampede and Intel (hereafter "Agreement", annexed as Exhibit "A") which specifically provided for exclusive jurisdiction of the State and Federal courts of Delaware for any dispute arising out of or related to the Agreement.

**FACTS**

6. This dispute involves Stampede, Intel, and the distribution ecosystem for the Falcon 8+ drone manufactured by Intel. Intel is the manufacturer of the drone and is responsible for the research and development, manufacturing, and the commercial proposition (product costs and profit margin) that is offered for evangelizing, selling, installing, supporting and servicing their products.

7. For products such as the Falcon 8+ drone, Intel contracts with distributors, such as Stampede, to assist in the creation of a distribution network and the sale of the product through its dealer network. Stampede's customers, the dealers, resell the product to end-users. End-users may include corporate, government, education and enterprise entities. Stampede as a trade only distributor recruits dealers to be part of the distribution ecosystem. The product is sold by the distributor, such as Stampede, to the dealer who generally bundles the hardware/software of the drone with services, such as training, for sale to the end user.

8. Stampede began discussions with Intel regarding acquisition of the Falcon 8+ Drone line in May 2017 at the AUVSI Tradeshow.

9. On or about August 8 and 9, 2017, Stampede met with Intel leadership at the Intel Headquarters in Santa Clara, California to discuss, among other things, the requirements to

become a distributor, the process and procedure of a purchase order, and the particulars regarding the order process.

10. On or about August 29, 2017, Stampede and Intel entered into their Agreement.

11. On September 6, 2017, Intel delivered the keynote speech at the Inter-Drone Tradeshow wherein Intel touted the Falcon 8+ as a revolutionary, next generation capability for unmanned systems technology leveraging artificial intelligence to solve the bottleneck of data processing in making data actionable in a scalable, enterprise friendly way. Intel touted that "data is the new oil".  Intel also showcased its "Real-Sense" anti-collision and stability technology, which was critical to doing the live demonstration that was shown at Inter-Drone. The Real-Sense technology failed to materialized and was never released.

12. After the conclusion of the Inter-Drone Tradeshow, Stampede committed to its first purchase order.

13. There were at the time many competitors in the unmanned systems industry.  Intel was not a dominant player in the sale of the drone hardware, especially considering that their drone hardware was inferior to industry leaders.  What set the Falcon 8+ apart from its competitors was the ability to function as a tool for collection of highly precise digital data. The data that could be actualized and leveraged as part of a larger historical data record.   Intel appreciated the equation that the drone creates digital data content.  That content requires data storage, and Intel excels at data storage.

14. Intel's version of the drone with its ability to create and manage data through its software was far more valuable than just the hardware alone.  Hence the price for the hardware coupled with Intel's software solution was significantly higher than the price of the drone hardware alone, and significantly more expensive than the competition.

15. The value proposition of the Falcon 8+ drone can best be compared to that of an iPhone. What makes the iPhone so useful and able to support a significant price point is the ability to access the countless apps available. With the Falcon 8+ drone, the value derived from access to the various payloads and platforms that facilitate the drone creating digital content of value to the end user.

16. The capabilities of the drone relied entirely upon an anticipated platform known as "Insight". Insight was promised as a revolutionary concept that would allow users to manage large, complex data sets and to provide them with automated analytics which would provide a heretofore unavailable end to end solution to the customer from drone platforms to data analytics.

17. Intel's presentation at Inter-Drone generated immediate interest in the product and established market expectation that Intel would provide a product which was a viable alternative to other manufacturers. The optimism regarding the product was tempered considerably after Stampede and other potential dealer partners received hands on instruction on the Falcon 8+ product and discerned the discernable gap between promise and actual product performance.

18. Issues with the Falcon 8+ drone included:

    a. It was discovered that the Falcon 8+ lacked any appreciable form of graphic user interface despite a Microsoft surface tablet built into the cockpit controller.

    b. Difficulties were discovered with the brightness of the screen which was clearly insufficient for commercial operations.

    c. The navigator was outdated and basic for a platform of such cost.

    d. The drone was never able to achieve the minimum advertised flight time of 16 minutes in real world conditions.

19. These issues were documented and communicated but ultimately discounted by optimism that an "end to end solution" would be coming sometime in quarter one or two of 2018. Stampede remained optimistic in the anticipated product since the hardware was not the focus of the solution. Although the hardware may have had shortcomings compared to the dominant forces in the industry, these forces would be overshadowed by the full solution comprised by the promised artificial intelligence inside platform.

20. Stampede proceeded to recruit dealers for the Falcon 8+ drone. In December 2017, Stampede recruited its first authorized dealer and subsequent thereto met with numerous other potential dealers. Many promising dealers declined citing the high cost for an unproven hardware system without an "end to end solution" available. They indicated they would reconsider once Insight was released. Intel continually maintained the pretense that Insight would become available in the near future.

21. David Morris of Intel's Drone Team understood the challenges Stampede had with development of dealer channels based on the lack of the Insight product. In an attempt to combat these issues Morris devised certain incentive and marketing opportunities to spark interest from dealers and to help current dealers begin to realize their investments. Unfortunately, these incentives were not successful.

22. In March 2018, based on significant concerns over stale inventory, representatives of Stampede met with Intel to discuss strategies to increase sales, rectify the shortcomings in the product, and to negotiate the terms of payment for the stagnant inventory. Stampede was withholding payment and Intel was on the verge of discontinuing the relationship and writing off more than $1 million of unpaid invoices.

23. During this meeting Intel disclosed that Insight was still not ready and would not be available until at the earliest quarter three or quarter four of 2018. Intel still had not calculated the price of Insight to ensure it would be attractive to all small operators as well as profitable to large enterprise clients. Intel revealed they had two to three new promising payloads available for the drones consisting of photographic and other equipment which would leverage Intel Real Sense technology to maneuver the focus away from Insight temporarily until the platform was available.

24. Pursuant to agreement reached between Kevin Kelly, the CEO of Stampede, and David Morris of Intel, it was agreed that Stampede would pay the open invoices and Intel would agree to take the product back if it did not sell through. Stampede was comfortable with this arrangement because the Agreement already stated that Stampede would not be hurt economically through their relationship (see Agreement Section 5.5, Exhibit A).

25. Stampede and Intel entered into an Amendment to Agreement providing for the return of stale inventory which enabled Stampede to make payments by the end of March. This was fiscal year end of Intel so the result was that Intel did not need to write off the $1 million of aged invoices that were paid, an important consideration to Intel. (Amendment to Agreement annexed as Exhibit B). Stampede would not have paid the $1 Million open invoices but for the assurances made by Intel regarding the ability of Stampede to return inventory to Intel.

26. Stampede left the meeting reaffirmed in the confidence in Intel, the Falcon 8+ Drone, and the anticipated new payloads that would be announced at an upcoming tradeshow. Unfortunately, subsequent promotional programs were unsuccessful and resulted in dramatically reduced numbers of dealers added to the network and lower than expected sales volume from existing authorized dealers.

27. The relationship between Intel and Stampede was marked by continued changes to the Intel Drone Team and meetings between Stampede and Intel to discuss the status of the relationship and ways to solve the aging glut of inventory that Stampede held. Stampede repeatedly conveyed to Intel that the drone airframe was significantly overpriced as compared to competition and requested that Intel explore a "beat competition" pricing solution compared to Intel's competitors since there was no clear indication as to when or if Insight would ever be ready for distribution.

28. Intel declined interest in taking returns on the product which at that point aged over 365 days in Stampede's inventory. Based on current run rates, lack of appreciable pipeline opportunities, lack of clarity on Insight availability, and lack of any appreciable effort to address the glaring performance deficiencies in the design of the system there was little if any realistic prospects for the sale of the drone units.

29. On August 30, 2019, Intel announced that the Falcon 8+ drone would be discontinued effective November 28, 2019.

30. Intel failed to deliver on the value proposition originally messaged during the launch of the Falcon 8+ drone and relied upon by Stampede in making a decision to become a distributor, as well as subsequent accessories/payload launches. These value support products were key to the success of the Falcon 8+ drone as an industrial solution. Without the Insight platform, the Falcon 8+ drone filled a very small niche in the market and would require customers who were willing or must overlook the performance deficiencies in order to meet customer demands for data secure platforms. The hardware was an entire generation behind other manufacturers and nearly two generations behind the market leading product offerings.

31. Intel knew of their inability to deliver Insight as promised and yet continued to assert that it was "just around the corner" and induced Stampede to rely on that expectation in purchasing the drones for resale.

32. The significant deficiencies in the product doomed the efforts of Stampede and effectively made the inventory unsellable due to the price except to a small select customer base. The inventory on hand at Stampede far exceeded available demand in the channel.

33. Intel's acts and omissions negatively impacted the ability of Stampede to market the drone product. These included but were not limited to:

    a. The Intel Insight platform was touted as a cloud based visual data management system enriched with applications such as photogrammetry services, report generation tools, annotation and measurement tools, and processing analytics. Intel promised that the platform would allow the user to organize and store the visual data from a variety of different sources, including drones, enabling the use of analytics which would further foster data driven insights for key business decisions. Despite multiple promises, delays and excuses, Intel never brought the Insight platform to market for the Falcon 8+ drone. Given the substantial hype of Intel touting the Insight platform, coupled with deficiencies in the hardware, potential customers grew disillusioned and ultimately resorted to other competitive products in the marketplace.

    b. Hardware deficiencies plagued the product from inception. The hardware platform comprising the Falcon 8+ Drone was mediocre at best and significantly below cutting-edge competitors. Intel was aware of the deficiencies in the product which included a lack of graphic user interface despite use of a capable surface tablet in design of the cockpit remote control; a screen too dim for operations in sunny conditions; a lack of flight time in real world

conditions commensurate with published flight times; flight times well below competitive products; a servo based gimbal system far behind industry standards for image stabilization; an inability to capture stabilized video for visual inspection data due to gimbal design, among other hardware deficiencies.

        c.     Not only was the hardware technologically inferior to that of competitors, it also experienced well publicized failures including a March 28, 2019 Intel safety alert relating to batteries overheating and catching fire during charging. Coupled with already existing concerns regarding the inability of the battery to generate flight times as promised, the safety alert further eroded public confidence in the product and accentuated difficulties in Stampede's sale of the product.

      34.     Intel's user-unfriendly interpretation of the warranty provisions effectively eliminated the warranty on the product held by Stampede and further made the inventory unsaleable. All end users received a "terms and conditions document" prepared by Intel at the time of the sale. Among the terms and conditions is a warranty extending one year from the date of shipment to the end user by Intel. Intel however took the position that the warranty provision contained in Section 9.1 of the Agreement between Intel and Stampede overrode and controlled the warranty. Pursuant to the terms of that section, products are warranted to materially conform to specifications for one year from the date of resale or shipment to its customers or 15 months from the date that Intel ships to the distributor (such as Stampede), whichever ends earlier. Batteries and chargers are warranted for 6 months or 150 cycles from the date of Intel shipment to Stampede.

      35.     The end user customer has a reasonable expectation of a 12 month warranty on the product and a 6 month warranty on the battery. Through no fault of the customer the

warranty of less than the expected 12 months was provided thereby resulting in required repairs that would otherwise be subject to the warranty considered as non-covered.

36. The situation of erosion of the customer's warranty existed whenever a product was received by Stampede and sat on Stampede's shelf for over three months. Stale inventory of Stampede thereby decreased the available warranty to the end user. In fact, under the present circumstances as a consequence of the period Stampede has held the stale inventory exceeding 15 months, there is no longer any warranty on Falcon 8+ drones sold by Stampede to dealers and end users. This damages confidence in the product and further makes the inventory virtually unsalable.

37. Intel sells Falcon 8+ drones only through distributors so its interpretation of the warranty as commencing when the product is in the hands of the distributor instead of the end-user is unreasonable and unconscionable. Intel is enriched by its avoidance of its otherwise existing obligations to make warranty repairs.

38. Intel has a duty under Section 5.5 of the Supply and Resale Agreement to work with Stampede to minimize the financial harm caused by excess inventory. In particular, Section 5.5 of the Agreement states:

> Inventory. Intel and Reseller will work together to minimize the financial harm cause to both parties by excessive Reseller Inventory, and will meet periodically to review and agree upon mutually acceptable goals for product backlog and inventory.

39. As a consequence of the slow-moving inventory and the meeting with Intel discussed previously herein, Intel and Stampede entered into the Second Amendment to the Agreement providing for stock returns. The amendment provided:

> 5.8 Stock Rotation Returns. Stock Rotation Returns are non-technical returns authorized by Intel to allow for return of the slow-moving inventory. Reseller may make stock rotation return requests to Intel throughout the term.

40. Stampede's complaint about slow inventory and the lack of the Insight platform resulted in Amendment Number 2. David Morris of Intel expressly assured Stamped that if it could not move inventory, that it would have the right to return the inventory pursuant to the Agreement.

41. On or about March 10, 2019, Stampede contacted John Vossoughi of Intel and requested return of the excess inventory pursuant to the Agreement. In an e-mail dated March 13, 2019, Mr. Vossoughi rejected the request for returns.

42. As a consequence of the rejection by Intel, Stampede is left with unsalable inventory in an amount not less than $560,000.

43. Intel by virtue of its refusal to accept returns and its failure to work with Stampede to minimize the financial harm to Stampede by the excess inventory breached Section 5.5 of the Agreement and Section 5.8 of the Second Amendment to the Agreement.

44. As a consequence of Intel's breach, Stampede has been damaged in an amount not less than $560,000.

**FIRST CLAIM FOR RELIEF**
**BREACH OF CONTRACT**

45. Stampede repeats and realleges the allegations contained in paragraphs 1 through 44 as is set forth herein in their entirety.

46. Under the Agreement and the Second Amendment to the Agreement, Intel had a contractual obligation to accept return of the excess inventory.

11

47. Intel has wrongfully refused to accept the return of the excess inventory in breach of Section 5.5 of the Agreement and Section 5.8 of the Second Amendment to the Agreement.

48. As a consequence of Intel's breach, Stampede has been damaged in an amount not less than $560,000.

## SECOND CLAIM FOR RELIEF
## BREACH OF GOOD FAITH AND FAIR DEALING

49. Stampede repeats and realleges the allegations contained in paragraphs 1 through 48 as is set forth herein in their entirety.

50. The implied covenant of good faith and fair dealing applies in every contract governed by Delaware law.

51. The implied covenant of good faith and fair dealing applies to the Agreement and all amendments thereto, including but not limited to Amendment #2.

52. The implied covenant of good faith and fair dealing requires every party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from recovering the fruits of the bargain. The implied covenant of good faith and fair dealing imposes on Intel an obligation to refrain from taking any action that would increase the likelihood that Stampede would incur financial harm as a consequence of entering into the Agreement with Intel.

53. The implied covenant of good faith and fair dealing imposes on Intel an obligation to refrain from taking any action that would decrease the value of the inventory of Falcon 8+ drones acquired by Stampede for resale, or that would make resale of drones from the Stampede inventory less profitable.

54. The express provisions of the Agreement, in particular Section 5.5, require Intel and Stampede to work together to minimize the financial harm caused to both parties by

12

excessive distributor inventory and that Intel and Stampede will meet periodically to review and agree upon mutually acceptable goals for product backlog and inventory.

   55. The express provisions of the Agreement, however, leave a gap and do not address any of the following issues:

    a. How Intel and Stampede are to work together to minimize the financial harm caused by excessive distributor inventory.

    b. The circumstances under which Intel would be required to take back inventory.

    c. The amount of inventory Intel would be obligated to take back in the event of backlog of the inventory.

    d. The procedure for return of the inventory.

    e. A reasonable amount of inventory for Intel to accept in return

    f. Remedies available to Stampede in the event Intel arbitrarily or unreasonably refuses to minimize any financial harm caused to Stampede as a consequence of excessive inventory.

    g. The remedies available to Stampede in the event Intel increased the financial harm to Stampede as a consequence of decisions made by Intel regarding the Falcon 8+ Drone, including but not limited to Intel's decision to limit the warranty, Intel's decision not to reduce price or increase the marketability of the drones, and Intel's decision to terminate the drone line while Stampede maintained significant inventory levels of the drone.

   56. The express provisions of Amendment #2 to the Agreement and in particular paragraph 5.8 provide that stock rotation returns may be authorized by Intel for the return of slow-moving inventory and that Stampede may make stock rotation return requests to Intel

throughout the term of their Agreement. The express provisions of Amendment #2 to the Purchase Agreement contain a gap and do not address a number of issues including but not limited to:

    a.    The conditions under which Intel must authorize return of the slow-moving inventory.

    b.    The circumstances under which Stampede as distributor may make stock return requests to Intel throughout the term.

    c.    A reasonable amount of inventory for Intel to accept in return.

    d.    The procedure for and remedies available to Stampede for the arbitrary or unreasonable refusal of Intel to allow any returns of slow-moving inventory and/or the rejection of stock return requests by Intel.

57.    All of these implied provisions are consistent with the express obligations that Agreement and Amendment #2 do not contain, and they serve to protect the spirit of the Agreement and the amendments thereto and their express obligations.

58.    Intel's actions deprived Stampede of the fully bargained for benefits under the Agreement and Amendments thereto and constituted material breach of Intel's implied covenant of good faith and fair dealing owed to Stampede under the Agreement and Amendments thereto.

59.    Stampede has been damaged by Intel's breach of the implied covenant of good faith and fair dealing in an amount to be determined at the time of trial, but not less than $560,000.

## PRAYER

**WHEREFORE**, Plaintiff demands judgment against Defendant as follows:

A. Damages in the amount not less than $560,000 together with costs, disbursements, expert fees and attorneys' fees;

B. Trial by jury on all issues so triable; and

C. Such other and further relief as this Court deems just and proper.

|  |  |
|---|---|
|  | PRICKETT, JONES & ELLIOTT, P.A. |
| OF COUNSEL: | */s/ Eric J. Juray* |
| Charles C. Swanekamp | Eric J. Juray (#5765) |
| BOND, SCHOENECK & KING, PLLC | 1310 N. King Street, Box 1328 |
| Avant Building, Suite 900 | Wilmington, Delaware 19899 |
| 200 Delaware Avenue | (302) 888-6500 |
| Buffalo, New York 14202-2107 | ejjuray@prickett.com |
| (716) 416-7000 |  |
| cswanekamp@bsk.com |  |
| Dated: December 30, 2020 | *Attorneys for Plaintiff* |